UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

DEMAJIO JEROME ELLIS,

    Plaintiff,

    v.       CAUSE NO. 3:25-CV-1051-GSL-JEM

IDOC, et al.,

    Defendants.

OPINION AND ORDER

Demajio Jerome Ellis, a prisoner without a lawyer, was granted leave to proceed on a claim that medical providers at Miami Correctional Facility (MCF) are denying him needed medical care for mobility problems, mental illness, a broken nose, and other infirmities. (ECF 7.) He moves for a preliminary injunction requiring that he be given various forms of relief while this case is pending, including but not limited to a "full body MRI" and other diagnostic testing, nitroglycerin, a CPAP machine, a walker, and a referral to an ear, nose, and throat (ENT) specialist. (ECF 4.) The court ordered a response from the Warden, which has now been filed (ECF 20), as has the Warden's amended response. (ECF 22.) More than seven days have passed and Ellis did not file any reply in support of his motion. *See* N.D. Ind. L.R. 7-1(d)(2)(B).

BACKGROUND

Medical records submitted by the Warden reflect that in May 2025, Ellis was transferred to the restrictive housing unit at MCF from another facility. (ECF 22-1 at 7.) He is 32 years old and has been diagnosed with Anti-Social Personality Disorder and

Substance Use Disorder. (*Id.*) He has a history of substance abuse, including fentanyl. (ECF 22-2 at 39.)

In early May 2025, Ellis presented to the infirmary complaining of "constant and continuing severe and excruciating pains" due to reported injuries in his back, neck, right shoulder, arm, both knees, both ankles, both wrists, and finger/knuckle.[1] (ECF 22-1 at 1.) A nurse placed him on the provider list for further evaluation. (*Id.*)

That same day, a social worker performed an assessment of his mental health needs. Her evaluation showed that his mental status was "unremarkable," and that his thought process, thought content, cognition, and mood were all within normal limits. (*Id.* at 3-4.) She told him she would follow up with him the following week and that he should report any concerning symptoms. (*Id.* at 4.)

On May 14, a full mental health assessment was conducted by Dr. Lauren Rogers, a psychologist, due to his placement in restrictive housing. (*Id.* at 4-43.) It was noted that he was not currently being prescribed any psychotropic medication and did not meet the criteria for a "Seriously Mentally Ill" designation. (*Id.* at 43.) He was assessed for suicidal risks but none were found. (*Id.* at 28.) The psychologist's evaluation showed that his mental status was "unremarkable," and that his thought processes, thought content, cognition, and mood were all within normal limits. (*Id.* at 43-44.) A referral was made for him to start psychotherapy sessions with mental health providers every 90 days. (*Id.* at 33.) He also receives routine mental health monitoring

---

[1] It is noted elsewhere in the medical records that Ellis reported fainting in 2019 and injuring his back. (ECF 22-1 at 60.) He also reported breaking his hand and nose and being stabbed. (ECF 22-2 at 39.)

by staff who make rounds through the restrictive housing unit. (*Id.* at 35, 43; ECF 22-2 at 1-28.)

On June 10, Ellis was seen by Dr. Carl Kuenzli and reported nasal issues and pain. (ECF 22-1 at 47.) Dr. Kuenzli noted a prior nasal bone fracture, chronic lower right back pain, chronic ankle and knee pain, and right-hand joint pain. (*Id.* at 49.) For the nasal issues, Dr. Kuenzli prescribed a steroid nasal spray. (*Id.*) For Ellis' various complaints of pain, Dr. Kuenzli prescribed the pain medication meloxicam. (*Id.*)

That same day, Ellis was assessed by another psychologist, Dr. Rachel Ballard. (*Id.* at 51.) He reported paranoia, stress, anxiety, nightmares, and mood changes, and claimed he was sometimes awake for 40 hours or more. (*Id.*) He reported that he believed the world will end in three years but refused to elaborate when she asked him why he believed that. (*Id.*) He told her he was "not interested" in any psychotropic medication other than Wellbutrin.[2] (*Id.*) She noted that his mood was "irritable," but his thought processes, thought content, and perceptions were otherwise normal. (*Id.* at 52-53.) She also noted that he had "minimal" insight and "mostly blames others for [his] problems." (ECF 22-1 at 53.) Dr. Ballard encouraged Ellis to submit a health care request if any concerns arose. (*Id.*)

On June 17, staff created an individualized action plan for Ellis regarding his mental health. (*Id.* at 55-57.) This included increasing positive peer interactions,

---

[2] It has been noted that "Wellbutrin is a highly abused and trafficked drug within the [Indiana Department of Correction] and prisons across the country." *Tripp v. Corizon*, No. 217-CV-00045-JMS-DLP, 2018 WL 5923988, at *2 (S.D. Ind. Nov. 13, 2018).

3

maintaining stability in his mental health through psychotherapy sessions, and revisiting his medication needs approximately every 90 days. (*Id.*)

On that same date, Ellis had a nursing visit and requested a walker. (*Id.* at 59.) Based on the nurse's notes, Ellis previously had a walker but it was taken away from him. (*Id.* at 60-61.) She performed a physical assessment and observed that Ellis had a normal gait and a normal range of motion in both knees and ankles, with no weakness. (*Id.* at 61.) He was able to walk without difficulty when asked to step on the scale. (*Id.*) He denied any recent injuries or falls. (*Id.*) The nurse noted that Ellis was being housed in restrictive housing and was not permitted to leave his cell often. (*Id.*) She was also unable to find a reason why he had been provided with a walker in the first place. (*Id.*) She made a referral to the provider for further evaluation. (*Id.*)

On July 1, Dr. Rogers met with Ellis regarding his mental health concerns. (ECF 22-2 at 29.) At that time, he told her that Wellbutrin was the "only medication that works" for him. (*Id.*) However, Dr. Rogers noted that he last took a psychotropic in 2021—four years earlier—and that he had voluntarily discontinued it. (*Id.*) Additionally, this medication was not Wellbutrin. (*Id.*) In her assessment, he did not have any concerning mental health symptoms at that time. (*Id.* at 29-31.) However, she referred him to the psychiatrist to discuss his desire for psychotropic medication. (*Id.* at 29.)

On July 8, Ellis was seen by a psychiatrist. (*Id.* at 38-43.) The doctor reviewed his history and concerns with him, and noted that he appeared "sad," "anxious," and "suspicious," but his thought processes, thought content, and cognition were otherwise

4

within normal limits. (*Id.* at 40.) The doctor prescribed a psychotropic drug (not Wellbutrin) and also discussed with him the possibility of prescribing a medication used to treat substance abuse disorder at a later point depending how he was feeling. (*Id.* at 40, 45.)

Also on July 8, Ellis was seen by Dr. Kuenzli regarding his medical concerns. (*Id.* at 32-36.) He complained of nasal drainage, as well as knee, ankle, wrist, shoulder, and hand pain, and requested an x-ray for his nose and a walker for his chronic pain issues. (*Id.*) After examining him, Dr. Kuenzli prescribed a nasal inhaler and prednisone for a nasal polyp. (*Id.*) The doctor issued an order for a heart-healthy diet and renewed his prescriptions for a high blood pressure medication, aspirin, an asthma inhaler, and another medication for asthma. (*Id.*) The doctor's examination revealed that Ellis had normal range of motion in his ankles, knees, and wrists, no visual swelling or abnormalities in any of his extremities, but some tenderness in one of his arms. (*Id.*) The doctor did not authorize any x-rays or a walker. (*See id.*)

On July 12, he was seen by a nurse who took his vital signs, which were normal. (*Id.* at 47.) He saw Dr. Kuenzli again on July 15, at which time he requested "medical shoes" for the shower, a pass for the disabled shower, a pass to be "cuffed in front," and a CPAP machine.[3] (*Id.* at 49-53.) Dr. Kuenzli took his vital signs, which were normal, and noted that he "will need to research all this." (*Id.* at 50.) The doctor noted that Ellis

---

[3] It appears that Ellis may have been given a CPAP machine at a prior facility, as a record makes note of him reporting that he had one in September 2024, which was before he arrived at MCF. (*See* ECF 22-2 at 49.)

5

"stands okay" and his ankles appeared stable, but he could not complete a full musculoskeletal exam because of Ellis' restraints. (*Id.* at 51.) Ellis was seen again by Dr. Kuenzli on July 29. (*Id.* at 53.) Ellis requested an outside appointment with an ear, nose, and throat specialist. (*Id.*) Dr. Kuenzli examined him and noted that he had "excellent" left nostril air flow and "a bit less but adequate" right nostril air flow. (*Id.* at 55.) Dr. Kuenzli directed that Ellis should continue using the nasal steroid and did not order an appointment with an outside doctor. (*Id.*)

Also on July 29, Ellis was seen by a psychologist for a psychotherapy session. (*Id.* at 57.) She noted that he was "slightly depressed and irritable" but otherwise "cooperative, logical, and well-oriented." (*Id.*) He expressed anger about his "perceived medical problems." (*Id.*) She attempted to "assist him with cognitive reframing to focus on what he could control," but was unable to refocus him. (*Id.*) She noted that he otherwise appeared to be functioning within normal limits. (*Id.* at 58-59.)

On August 9, Ellis was seen by a nurse after reporting that he had slipped in the shower. (*Id.* at 60.) He complained of a knot on his head and pain in his back and ankle, but the nurse could find no visible or palpable wound upon examining him. She also noted that he was able to turn his head, bend over, stand, and bear weight on his legs without issue, and that his pupils were appropriately reactive to light. (*Id.* at 60-61.) She consulted with a doctor, who recommended that there was no need for follow-up unless his symptoms worsened or did not subside. (*Id.* at 62.) He was instructed on using warm or cold packs on any areas in pain and to reduce his activity level, but was told he did not need bed rest. (*Id.* at 61.)

Ellis returned to the infirmary on August 16, again complaining of pain from the fall. (*Id.* at 63.) He reported that his fingers were broken, but the nurse found no signs of swelling, redness, or bruising, and noted that he was able to make a fist. (*Id.* at 65.) She also noted that he had a normal gait and "minimal restrictions on range of motion." (*Id.* at 64.) He was referred to the provider for additional evaluation, and it can be discerned that x-rays of his left ankle were later ordered. (*Id.* at 64-65.) The x-rays showed there was no skeletal injury, although he had soft tissue injury to one of his legs. (ECF 22-2 at 86.) Ellis returned to the nurse's station again on September 4, reporting pain in his hand from the fall. (*Id.* at 66.) The nurse noted no discoloration or swelling and observed that he had full range of motion in his hand. (*Id.* at 67.)

On September 18, he had a psychotherapy session with a mental health provider. (*Id.* at 69.) She noted his mental status was "unremarkable" and his functioning appeared within normal limits. (*Id.* at 70.) She noted no signs of distress or concerning symptoms. (*Id.*)

On September 23, Ellis was seen by Nurse Practitioner Kimberly Myers and asked for an inhaler and a hand x-ray. (*Id.* at 73.) She noted that he was currently taking high blood pressure medication, pain medication, and a psychotropic medication. (*Id.* at 73-74.) She conducted a respiratory examination and found his functioning normal, with no chest wall tenderness, cough, wheezing, or additional effort being used to breath. (*Id.* at 74.) She nevertheless renewed his prescription for an inhaler to be used as

7

needed. (*Id.*) She also ordered an x-ray of his right hand, although in her opinion he did not have a broken bone, but possibly a tendon issue.[4] (*Id.* at 73.)

On September 24, Dr. Ballard, the psychologist, reviewed his medical records and determined that he appeared compliant with his medication and had "overall stability" in his mental health symptoms. (*Id.* at 75.) A chart update was made on November 6, indicating that Ellis was currently taking two asthma medications, a psychotropic medication, and a pain medication. (*Id.* at 76.) Ellis missed an appointment with the psychiatrist on November 18, and a scheduled visit with Dr. Kuenzli on December 11, due to staffing shortages, but it was noted that the visits would be rescheduled. (*Id.* at 77-78.)

Ellis was seen by a mental health provider most recently on January 6, 2026. (*Id.* at 80.) He was assessed by Dr. Rogers, who noted that he was angry but otherwise appeared to be functioning within normal limits. (*Id.* at 81-82.) Also in January 2026, Ellis' order for a heart-healthy diet was renewed by medical staff for another six months. (*Id.* at 84.) He was also granted a low bunk/low tier pass for six months due to his reports of pain. (*Id.* at 85.)

## ANALYSIS

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original). A

---

[4] The results of the x-ray do not appear to be included in the present records. It appears that diagnosis related to this issue remains ongoing.

8

plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

On the first prong, "the applicant need not show that [he] definitely will win the case." *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020). However, "a mere possibility of success is not enough." *Id.* at 762. "A strong showing . . . normally includes a demonstration of how the applicant proposes to prove the key elements of [his] case." *Id.* at 763 (quotation marks omitted). In assessing the merits, the court does not simply "accept [the plaintiff's] allegations as true" or "give him the benefit of all reasonable inferences in his favor, as would be the case in evaluating a motion to dismiss on the pleadings." *Doe v. Univ. of S. Indiana*, 43 F.4th 784, 791 (7th Cir. 2022). Instead, the court must make an assessment of the merits as "they are likely to be decided after more complete discovery and litigation." *Id.*

On the second prong, "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with . . . injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. Mandatory preliminary injunctions—"those requiring an affirmative act by the defendant"—are "cautiously viewed and sparingly issued." *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020). Additionally, in the prison context, the court's ability to grant injunctive relief is limited. "[I]njunctive relief to remedy unconstitutional prison conditions must be narrowly drawn, extend no

9

further than necessary to remedy the constitutional violation, and use the least intrusive means to correct the violation of the federal right." *Westefer v. Neal*, 682 F.3d 679, 681 (7th Cir. 2012) (citation and internal quotation marks omitted); *see also Rasho v. Jeffreys*, 22 F.4th 703, 711-13 (7th Cir. 2022) (outlining strict limitations on granting injunctive relief in correctional setting).

Because Ellis' claims relate to the denial of medical care, they are governed by the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To prove a violation of this right, a prisoner must show (1) he had an objectively serious medical need and (2) the defendant acted with deliberate indifference to that medical need. *Id.* A medical need is "serious" if it is one that a physician has diagnosed as mandating treatment, or one that is so obvious even a lay person would recognize as needing medical attention. *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). On the second prong, the inmate must demonstrate "a culpability standard akin to criminal recklessness." *Thomas v. Blackard*, 2 F.4th 716, 722 (7th Cir. 2021). Inmates are "not entitled to demand specific care," *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 965 (7th Cir. 2019), nor are they entitled to "the best care possible." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). Rather, they are entitled to "reasonable measures to meet a substantial risk of serious harm." *Forbes*, 112 F.3d at 267. The court must "defer to medical professionals' treatment decisions unless there is evidence that no minimally competent professional would have so responded under those circumstances." *Walker*, 940 F.3d at 965 (citation and quotation marks omitted). In plain terms, the Eighth Amendment protects prisoners from "grossly

inadequate medical care." *Gabb v. Wexford Health Sources, Inc.*, 945 F.3d 1027, 1033 (7th Cir. 2019).

The court notes at the outset that Ellis' motion for a preliminary injunction seeks vast relief on a variety of issues, including an order forbidding officers to use tasers on him under any circumstances, an order that he be allowed to shower during daytime hours only, and an order requiring that he have an intercom system available to him. (ECF 4.) The court can only grant him relief related to the claims he is proceeding on in this case, and even then, can only order a remedy that is "narrowly drawn" and uses "the least intrusive means to correct the violation of the federal right." *Westefer*, 682 F.3d at 681; *see also Rasho*, 22 F.4th at 711-13 (observing that "injunction went well beyond the limits imposed by the PLRA," where the judge "mistakenly conflated what is constitutionally adequate . . . with what is constitutionally required"). Many of the specific forms of relief he seeks do not meet this criteria.

As for his request for various forms of medical care, the record does not show that prison medical staff are acting with deliberate indifference to his serious medical needs. Although he does have certain medical conditions, records reflect that staff have been attentive to his needs, examined him on multiple occasions, ordered testing, and prescribed him medications. *See Riley v. Waterman*, 126 F.4th 1287, 1295 (7th Cir. 2025) (in assessing deliberate indifference claim court must "look at the totality of an inmate's medical care"). Their professional opinion about which treatments are medically indicated, and which are not, is entitled to deference in this proceeding. *Walker*, 940 F.3d at 965. Ellis is not qualified to opine that he needs specific medications, a full body MRI,

11

or a referral to an ENT, and his mere disagreement with providers about the proper course of treatment does not establish an Eighth Amendment violation. *Lockett v. Bonson*, 937 F.3d 1016, 1024 (7th Cir. 2019). Nor does the fact that doctors at a prior facility may have provided different treatment options. *Pyles v. Fahim*, 771 F.3d 403, 410 (7th Cir. 2014).

As for his mental health issues, the record reflects that he has been seen and evaluated by mental health providers multiple times since his arrival at MCF in May 2025. He is currently under the care of a psychiatrist, who has prescribed him psychotropic medication, although not the medication of his choosing. His providers are well aware of his mental health diagnoses and the possibility of decompensation. In their view, additional treatment is not warranted at this time, but he will be continued to be monitored and have regular visits with mental health staff. His desire for a particular drug or disagreement with their treatment decisions does not establish a constitutional violation. *Lockett*, 937 F.3d at 1024.

In view of the present record, Ellis has not demonstrated a likelihood of success in proving that prison staff are acting with deliberate indifference to his serious medical needs. He also has not shown that he will be irreparably injured if he is not granted emergency relief while this case is pending. He has not demonstrated an entitlement to the extraordinary remedy of a preliminary injunction.

Ellis also moves for the appointment of a medical expert and for an evidentiary hearing at which the medical expert would testify.[5] The court, in its discretion, may appoint an expert pursuant to Federal Rule of Evidence 706 in appropriate cases. Fed. R. Evid. 706; *Martin v. Redden*, 34 F.4th 564, 569 (7th Cir. 2022). Court-appointed experts are generally utilized only if "scientific, technical, or other specialized knowledge" will assist the trier-of-fact understand complex evidence or facts. *Ledford v. Sullivan*, 105 F.3d 354, 358–61 (7th Cir. 1997). Rule 706 does not list specific factors to be considered when determining whether an expert is warranted, but denial of a request for an expert is generally proper when the issues are not complicated, when the relevant evidence can be understood by a lay person, and/or when an expert would not add to the trier-of-fact's understanding of the issues. *Id.* at 359-60; *see also Dobbey v. Carter*, 734 F. App'x 362, 365 (7th Cir. 2018).

Here, the medical issues are not particularly complex, and the court had no difficulty understanding the medical records. To the extent Ellis wants the court to appoint an expert at public expense to help him prove his case, that is not permitted. *Martin*, 34 F.4th at 569 (observing that "a court should ensure that the purpose of the expert's opinion is to aid the court, not the party seeking appointment"); *Doughty v. Grossman*, No. 23-1702, 2024 WL 550324, at *4 (7th Cir. Feb. 12, 2024) ("Rule 706 is used to appoint a neutral expert to interpret complex information for the trier of fact, not to

---

[5] He also mentions wanting appointed counsel to represent him at the evidentiary hearing, but because the court concludes that an evidentiary hearing is unnecessary, the court does not explore the matter further. If Ellis wishes to seek counsel to represent him generally, he is free to renew his request in a motion that addresses the factors outlined in *Pruitt v. Mote*, 503 F.3d 647 (7th Cir. 2007), including whether he made a reasonable attempt to obtain counsel on his own.

assist one party or the other[.]"). The court finds no basis to appoint an expert or to hold an evidentiary hearing at this stage.

For these reasons, the plaintiff's motion for a preliminary injunction (ECF 4) and motion for appointment of an expert (ECF 10) are DENIED.

SO ORDERED on February 12, 2026

/s/Gretchen S. Lund
JUDGE
UNITED STATES DISTRICT COURT